

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

SEP 2 6 2013

D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| FIRST NATIONAL BANK OF WYNNE, an Arkansas corporation,<br><br>Plaintiff,<br><br>vs.<br><br>TWIN CREEKS SPECIAL SERVICE DISTRICT, a Utah special service district, FEDERAL DEPOSIT INSURANCE CORPORATION, an independent agency of the United States, as Receiver for ARKANSAS NATIONAL BANK, NA, *et al.,*<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br>1) DENYING DEFENDANT FDIC-R'S MOTION FOR SUMMARY JUDGMENT (DKT. 36);<br>2) GRANTING PLAINTIFF FNB'S MOTION FOR SUMMARY JUDGMENT (DKT. 42);<br>3) GRANTING THE PARTIES' JOINT MOTION FOR SUMMARY JUDGMENT (DKT. 38); AND<br>4) OVERRULING FDIC-R'S OBJECTIONS (DKT. 59)<br><br>Civil No. 2:10-cv-01100-RS<br><br>Judge Robert J. Shelby |

This is an action brought to quiet title to disputed water rights and water stock relating to a residential property development project in Wasatch County, Utah (the Project). In 2006 and 2007, Arkansas National Bank (ANB) made three successive loans to a development company, WS Sleeping Indian Ranch, LLC (Sleeping Indian), for the Project. In exchange, ANB obtained three successive deeds of trust. Each is secured by identical collateral which includes "all water and riparian rights, wells, ditches, reservoirs, and water stock . . . . that may now, or at any time in the future, be part of the real estate . . . ." With the loans, Sleeping Indian acquired land, water rights, water stock, and other items needed for its development.

Then, both ANB and Sleeping Indian failed. The FDIC was appointed receiver (FDIC-R). FDIC-R negotiated the sale of its interest in the first of the ANB-Sleeping Indian deeds of

1

trust to Plaintiff, First National Bank of Wynne (FNB). FNB foreclosed on its collateral under that first deed of trust. The central issue before the court is whether the water rights and water stock acquired by Sleeping Indian are part of the collateral FNB possesses pursuant to foreclosure on that first deed of trust.

FNB initially filed this case in Utah's Fourth Judicial District Court. Defendant FDIC-R removed the case pursuant to 28 USC § 1441 (a) and (b), and 12 U.S.C. § 1819(b)(2), which delineates corporate powers for the FDIC and provides that in general, all suits against the FDIC "in any capacity . . . shall be deemed to arise under the laws of the United States."

On June 6, 2013, the court heard argument on the parties' cross-motions for summary judgment (Dkts. 36 and 42) and the parties' Joint Motion for Partial Summary Judgment. (Dkt. 39). David C. Wright and John H. Mabey, Jr. appeared on behalf of Plaintiff FNB. Jared M. Asbury represented FDIC-R. David B. Harvigsen appeared for Defendant Twin Creeks Special Service District (Twin Creeks). Lester Perry appeared but offered no argument for Defendant Ray Weller, an individual member of Sleeping Indian.[1] After considering the parties' respective memoranda, exhibits, and the argument of counsel, the court ruled from the bench, granting FNB's Motion for Summary Judgment (Dkt. 42), quieting its title to the subject water rights and

---

[1] Before removal to this court, FNB obtained leave for additional service of process pursuant to Rule 4(d)(4) of the Utah Rules of Civil Procedure. The residential real estate project for which the water rights at issue were intended is in Wasatch County. The generally circulated newspaper there is the *Wasatch Wave.* As ordered, FNB caused to be published in the *Wasatch Wave* a notice of this action and FNB's quiet title claims. That notice was approved by Utah Fourth District Court Judge Derek Pullan. There was no response to that notice. In addition, although Defendants WS Sleeping Indian and Raymond Weller answered in this action, and have been served with all motions and other filings, they did not otherwise engage in this litigation, did not answer discovery, and did not oppose or otherwise respond to either of the cross-motions for summary judgment. Counsel for Sleeping Indian and Weller personally were present at the summary judgment hearing but did not participate.

water stock described below, and denying FDIC-R's cross-motion for summary judgment. (Dkt. 36). The court also granted the parties' Joint Motion for Partial Summary Judgment. (Dkt. 39).

At the June 6 hearing, the court asked that counsel for FNB memorialize these rulings in a written order. Counsel for FNB submitted a proposed order on August 16. (Dkt. 58). On August 26, counsel for FDIC-R filed objections to that order, taking issue with its substantive analysis on three points of contract and water law. (Dkt. 59). Counsel for FNB responded to the objections (Dkt. 60), and counsel for FDIC-R filed a reply memorandum supporting the objections on August 27. (Dkt. 61). As discussed below, the court now memorializes its prior rulings from the bench. The court also overrules the FDIC-R's objections. The objections present legal argument, which is inappropriate as an objection to form. DUCivR 54-1(b).

## FACTUAL BACKGROUND

The facts material to resolution of this case are not disputed. The competing title claims to the contested water rights and stock (jointly called the Water Properties) described below turn on the application of Utah water and contract law to the terms of the controlling agreements.

Twin Creeks is a Wasatch County special service district established on June 20, 1994, pursuant to Utah Code Annotated §17D-1-101, *et seq.* and Wasatch County Resolution 94-6, to provided sewage collection, treatment and contract services within its jurisdiction in the Lake Creek and Center Creek areas of Wasatch County. On August 8, 1994, Twin Creeks' purposes were expanded to include water services pursuant to Wasatch County Resolution 94-18.

Sleeping Indian is a now-expired Utah limited liability company. It conducted business in Wasatch County, Utah. Sleeping Indian was the developer of the Project—real property in Wasatch County commonly known as Sleeping Indian Ranch.

3

On June 27, 2006, Sleeping Indian signed a deed of trust in favor of ANB, securing an

initial loan of $7,494,011 to purchase the Project property (First DOT). The First DOT was

recorded on June 28, 2006. It is secured by trust property consisting of the Project land,

> [t]ogether with all rights, easements, appurtenances, royalties, mineral rights, oil
> and gas rights, crops, timber … all water and riparian rights, wells, ditches,
> reservoirs, and water stock and all existing and future improvements, structures,
> fixtures, and replacements that may now, or at any time in the future, be part of
> the real estate described above (all referred to as 'Property').

The First DOT also defines the "Secured Debt" for the collateral to include "Debt incurred under

the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described

below and all their extensions, renewals, modifications or substitutions," as well as:

> all future advances from Lender to Grantor of other future obligations of Grantor
> to Lender under any promissory note, contract, guaranty, or other evidence of
> debt existing now or executed after this Security Instrument whether or not this
> Security Instrument is specifically referenced….

The First DOT provides that it "is complete and fully integrated." Individual Sleeping Indian

principals—Raymond Weller, Robert Madsen, and Jeffrey Scott—also personally guaranteed the

loan, with Weller having mortgaged his home.

At the time of the First DOT, Wasatch County required each residential lot to have

sufficient water for residential use, plus irrigation water sufficient for a minimum of one-quarter

acre of irrigated area. Additional water could be required depending on individual lot

circumstances.

Money from ANB in hand, Sleeping Indian bought the Project land, consisting of 295

acres, along with certain water shares in Lake Creek Irrigation Company, for $5,300,000.

Additional funds loaned under the First DOT were used to pay off stock Weller pledged and to

buy additional water shares.

4

A few months later, in October 2006, ANB extended another line of credit to Sleeping Indian to purchase more water shares and for other Project costs. The second loan totaled $2,347,500. A deed of trust relating to that loan (Second DOT) was recorded on October 20, 2006. The Second DOT was secured by precisely the same trust property as the First DOT.

The Project was approved for sixty-six small lots, with seventy-one larger lots in a contiguous mountain zone area, just outside of Heber City, Utah. The Project is in the service area of the Twin Creeks Special Service District. Twin Creeks required the transfer of water rights and water shares (collectively, Water Rights) necessary for the Project before Twin Creeks would issue a "will serve" letter, which was required by Wasatch County for Project approval.

ANB, the Project lender, ordered an appraisal on the Property, issued as of May 10, 2006. Concerning water, the appraisal identifies the following:

Water Shares

Certificate numbers and water amounts are as follows:

| Certificate Number | Total Water Shares |
|---|---|
| 398 | 3 shares of Lake Creek Irrigation Primary (27 acre feet of culinary) |
| 340 | 21, 1st class shares (21 acre feet of irrigation water) |
| 342 | 16.5 secondary shares (1/3 acre feet per share) |
| 344 | 3.5, 3rd class shares (1/15 acre foot per share) |
| 825 | 1 Lake Creek Primary Share (9 acre feet) |
| Under Contract | 9 Lake Creek Shares (81 acre feet) scheduled to close 5/26/06 |
| Under Contract | 3.5 acre feet of water available via the spring on the subject property. Currently researching adequate documentation. |

Based on the above information, this totals 147.23 acre feet of water. Inasmuch as the state standard in typically 0.43 acre feet per dwelling unit, the proposed development would require approximately 65 acre feet of water for culinary purposes (148 homes x .43 = 63.64 acre feet). The excess water would likely be used for landscaping and irrigation purposes.

5

In July 2007, Wasatch County's Planning and Zoning Department notified Sleeping Indian that preliminary approval of the Project required "the water necessary for the development." On September 5, 2007, the Wasatch County Council notified Sleeping Indian that "276.02 acre feet of water will be necessary to fully develop and improve" lots and other areas in the Project. On September 18, 2007, the Wasatch County Planning and Zoning Department notified Sleeping Indian of the density approval and that preliminary project approval would happen "once the developer acquires and escrows the water necessary for the development."

In connection with the anticipated Project approval, on or about October 15, 2007, Sleeping Indian and Twin Creeks entered into a Sleeping Indian Water Rights Escrow Deposit Agreement (Escrow Agreement). It provided that Sleeping Indian would transfer "Water Rights" for "use on the Project and in exchange for a 'Will-Serve Letter'" as follows:

- a. "Sleeping Indian will transfer, by quitclaim deed and/or transfer of stock certificate, the Water Rights [identified in the Agreement's Exhibit C]" to Twin Creeks free of encumbrance.

- b. In exchange, Twin Creeks agreed to issue a "will serve" letter, which is in turn required by Wasatch County in order to obtain county approval of the Sleeping Indian Project.

- c. Twin Creeks agreed to own, manage and develop the Water Rights for the benefit of the Sleeping Indian Project and to supply water for the Project.

- d. Twin Creeks agreed to file any necessary change applications or other administrative filings as necessary to develop the Water Rights for beneficial use and to be a part of the Project.

- e. Twin Creeks guaranteed water service to the Sleeping Indian Project as then designed, to the extent required by Wasatch County, and as necessary to fully

6

develop the Sleeping Indian Project to completion, including residential and secondary (irrigation) water service for each lot within the Project.

Twin Creeks further confirmed in the Escrow Agreement that the agreed "will serve" letter was in form and substance satisfactory to Wasatch County to obtain full County approval of the Project.

The Escrow Agreement identifies the following "Water Rights"— water rights and water stock—owned by Sleeping Indian "for use on the Project:"

A.    Lake Creek Irrigation Company

| | | |
|---|---|---|
| i. | Primary Shares – | 13.83 shares |
| ii. | First Class Shares – | 21 shares |
| iii. | Second Class Shares – | 38 shares |
| iv. | Third Class Shares – | 28.82 shares |

B.    Water Right No. 55-12315, representing 97 acre feet of water segregated from Water Right No. 55-9269.

Further, there was belonging to or a part of the Project 28.82 acre feet of Municipal and Industrial (M&I) water credit to be supplied to the Project by Twin Creeks. FNB has alleged and Twin Creeks admits that "on Exhibit C of the Escrow Agreement, the Lake Creek Third Class shares mistakenly represent the same water that is the 28.82 acre feet of M&I water credited in or to be supplied to the Project as part of the Project . . . [and that] the number of Lake Creek Third Class shares dedicated to the Project is 3.5."

The Wasatch County Council provided preliminary approval for the Project on December 19, 2007. The Wasatch County Planning Commission granted final approval for Phase 1 of the Project (66 single-family lots) on February 14, 2008.

7

As part of the effort to obtain the aforementioned Project approval, on October 17, 2007, Sleeping Indian signed a deed of trust to secure a third loan from ANB in the principal amount of $2,700,000 for the purchase of additional required water (Third DOT). The Third DOT was recorded on October 31, 2007. The Third DOT is secured by the same trust property securing the First and Second DOT's.

On or about December 5, 2007, ANB prepared a loan summary document describing its three loans for the Project. As of January 2008, the Property included all of the water rights/shares (276 acre feet either owned or under contract) necessary for full development.

On May 9, 2008, ANB was closed by the Office of the Comptroller of the Currency, and the FDIC was named Receiver.[2] In September 2008, ANB requested an appraisal of the Property. Concerning water rights, the resulting appraisal states in relevant part as follows (emphasis in original):

### Water Rights

According to Mr. Kent Madsen and Wasatch County water rights have been dedicated to Wasatch County for Phase 1 of the subject property. It is uncertain at the time of this report as to how much water is needed for future development of Phase 2. The subject currently has 55.72 shares of Lake Creek Water and 29.00 acre feet of M&I water. There are 21.5 shares under contract as well as 97.62 acre feet, 3.50 acre feet and 1/9 acre feet currently under contract with various entities. The subject has a total of 276 acre feet of water, whether owned or under contract. Water certificates can be reviewed in the addendum. *All values in this report are contingent upon the subject having all water shares needed for development.*

For purpose of the analysis, we assumed these water rights would be reserved or "vested" with the realty to facilitate and ensure future agricultural uses and future development consistent with estimated highest and best use.

---

[2] *See* http://www.fdic.gov/bank/individual/failed/anb.html (providing "Failed Bank Information).

8

SitusServ was the FDIC's servicing agent for the Project from approximately October 17, 2008, through July 15, 2011.[3] On or about March 10, 2009, SitusServ counsel sent to SitusServ a memorandum with recommendations concerning the ANB loans, which were then in default. At that time, it was expected that foreclosure of the First DOT (then still owned by the FDIC) "would probably pay off the senior lien [First DOT]," with possibly no recovery left except "from the guarantors." On or about March 31, 2009, counsel for SitusServ prepared a Case Resolution Report, outlining the ANB loans for the Project. According to the Report, both the Second and Third DOT's were secured by the Project land. The Report states that SitusServ was to "investigate if any water rights were perfected relating to the Third Deed of Trust and the value of those rights."

The Koepke Law Group represented ANB during 2008. In April 2008, Koepke wrote to Corner Bank (a participant in the purchase of ANB assets), stating the following:

     a.  ANB lent funds secured by Second and Third DOT's.

     b.  Those Second and Third DOT's are "junior lien positions on only the Development Property."

     c.  ANB was not foreclosing on those second and third loans, "as any attempt to do so is ultimately subject to the foreclosure of the [First DOT]."

     d.  "ANB recognizes that Loan Nos. 2 and 3 almost certainly will be unsecured at the conclusion of this foreclosure and sale of the Development Property . . . ."

---

[3] FDIC-R describes SitusServ's role as its "servicer" (FDIC-R Memo., Dkt. 37, at xii), and as an entity which "handled matters relating to [the Project] in conjunction with *and on behalf of* the FDIC" during the agreed dates. (FDIC-R Opp. Memo., Dkt. 50 at xi) (emphasis added).

In May 2008, Koepke wrote to the FDIC explaining that foreclosure of the First DOT against "the Development Property" would "cut[] off potential for ANB junior lien recovery."

On April 9, 2009, Sleeping Indian executed an Addendum to Real Estate Deed of Trust (Addendum). Sleeping Indian is the only party to the Addendum, and its Manager, Ray Weller, is the only signatory to the Addendum, although the Addendum was negotiated between Sleeping Indian and FDIC. In the Addendum, Sleeping Indian:

   a. recites that the "FDIC has been appointed as a receiver for ANB";
   b. recites that the Third DOT encumbers certain real property in connection with the Project;
   c. recites that the Third DOT "encumbers all water and riparian rights and water stock" intended for the Project;
   d. recites that a substantial portion of the ANB loan given in return for the Third DOT were used to purchase specific water rights and water stock in the Lake Creek Irrigation and Wasatch Irrigation Companies.

In the Addendum, Sleeping Indian purports to have received valuable consideration from an unidentified entity in return for "confirm[ing] and clarif[ying] that the [Third] Deed of Trust encumbers all of [Sleeping Indian's] right, title and interest in and to the Water Rights listed on the attached Exhibit B, and any subsequent rights for water relating to the Property resulting from the contribution or assignment of the Water Rights to the Service District." The Addendum does not mention the First or Second DOT's.

On June 30, 2009, FNB and others entered into an Assignment and Assumption Agreement concerning the First DOT. This Assignment and Assumption Agreement was recorded on July 7, 2009. It provides that, upon the sale of the First DOT to FNB, the FDIC "shall have no further interest in the loan."

The FDIC sold its remaining interest in the First DOT to FNB on July 30, 2009. On

December 7, 2009, FNB acquired a Trustee's Deed pursuant to a Trustee's foreclosure sale on

the Project. The Trustee's Deed was recorded December 10, 2009.

FNB asked Twin Creeks to inventory the Water Rights. On May 25, 2011, Twin Creeks

provided that inventory. (Attached to FNB's Memo. at Ex. 22, Dkt. 43-22). It identified water

rights and water stock certificates transferred to and held by Twin Creeks "for the Sleeping

Indian Project." To summarize, these disputed Water Properties held by Twin Creeks are:

1.    Water Right No. 55-12315, representing 97 acre feet of water segregated
from Water Right No. 55-9269;

2.    28.82 acre feet of M&I water credit in or to be supplied to the Project by
Twin Creeks; and

3.    Lake Creek Irrigation Company stock as follows:
   a.    Primary Shares –             13.83 shares
   b.    First Class Shares –         21 shares
   c.    Second Class Shares –        38 shares
   d.    Third Class Shares –         3.5 shares

4.    1.14 total shares of Wasatch Irrigation Company Stock. Twin Creeks
explains that the "water represented by these shares is not usable at the Sleeping
Indian Ranch development, so the District conveyed these shares to Heber City in
exchange for 3.876 acre-feet of M&I water that can be used at the development."
Thus, although Twin Creeks "no longer has possession of the stock certificates,"
it "may be able to undo the exchange, if necessary."

Seven primary shares of Lake Creek Irrigation Company were specifically and separately

encumbered by the First DOT and its accompanying security agreements and collateral pledges

and UCC filings, and there was no contention that they were not so encumbered by any of the

parties.

11

## I. THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Each of the First, Second, and Third DOT's securing loans from ANB to Sleeping Indian provide that the respective loans are secured by the Project land "[t]ogether with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber…, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as 'Property')." The critical question in the parties' cross-motions is whether the water rights and stock that were obtained subsequent to the First DOT are "part of the real estate" securing the initial loan from ANB. If so, the remaining question is whether FNB took those rights in first position when it purchased from FDIC-R its interest in the First DOT. For the reasons discussed below and on the record at the June 6 hearing, the court answers both questions in the affirmative. As a result, the court finds that FNB is entitled to summary judgment, and that the FDIC-R's motion for summary judgment must be denied.

Summary judgment on these issues is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). This case turns on contract interpretation, including the interpretation of the three DOT's and the Addendum later executed. The interpretation of these documents under the uncontroverted facts is appropriately decided as a matter of law.

Under Utah law, deeds are interpreted like any other contract. *Capital Assets Fin. Serv. v. Lindsay,* 956 P.2d 1090, 1093 (Utah App. 1998). "If the language within the four corners of

the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Trans-Western Petroleum v. U.S. Gypsum,* 584 F.3d 988, 993 (10th Cir. 2009) (citing *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 44, 201 P.3d 966, 975); *see also Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 7, 201 P.3d 1004, 1007 ("Questions of contract interpretation which are confined to the language of the contract itself are questions of law . . . ."). Additionally, "whether a contract is ambiguous is a question of law . . . ." *Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 10, 182 P.3d 326, 329.

Ambiguity is present only when the contract language reasonably supports competing interpretations offered by the parties. *Daines v. Vincent,* 2008 UT 51, ¶ 31, 190 P.3d 1269, 1277 (citations omitted). Rarely will a contract support reasonable competing interpretations. *Id.* at ¶ 30 n.5. Evaluating the question of ambiguity, the court looks to "harmonize all of the contract's provisions and all of its terms." *Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599, 605 (citations omitted). The entire agreement is evaluated—"all of its parts in relation to each other"—giving a "reasonable construction of the contract as a whole to determine the parties' intent." *Gillmor v. Macey*, 2005 UT App 351, ¶ 19, 121 P.3d 57, 65 (citations omitted). The objective is to "look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." *Peterson & Simpson v. IHC Health Serv., Inc.*, 2009 UT 54, ¶ 13, 217 P.3d 716, 720 (citations omitted).

## A. The First DOT governs the ownership of the disputed Water Properties

Under the Assignment agreement between FDIC-R and FNB, FNB purchased 1) FDIC-R's participation in and any collateral secured by the First DOT, and 2) other items listed in the

loan documents set forth in the Assignment.[4]  The First DOT was the first-recorded among the three DOT's.  Thus, the First DOT has priority over the others. *See FDIC v. Taylor,* 2011 UT App 416 ¶ 14, 267 P.3d 949, 957 ("priority of competing interests is determined by Utah's race-notice principles") (citing UTAH CODE ANN. §§ 57-3-102 to –103); *Tracy Collins Bank & Trust Co. v. Seiger,* 546 P.2d 237, 238 (Utah 1976) (first recorded trust deed had priority over subsequent trust deed secured by the same property in foreclosure actions; interest of subsequent property buyers and lenders was subordinate).

This first position First DOT governs the disposition of the disputed Water Properties—water rights and stock in the Lake Creek and Wasatch Irrigation Companies.  This conclusion is compelled by the plain language of the three DOT's.  Each of these DOT's identify precisely the same collateral for the respective loans.  The critical language in the First DOT is identical to that in the Second and Third DOT's:

> [t]ogether with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber … all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as 'Property').

Thus, each DOT includes as collateral "all water … rights …, and water stock … that may now or at any time in the future, be part of the real estate described above (all referred to as 'Property')."  The "secured debt" under the DOT's included debt incurred under all the notes and their extensions, renewals, modifications, or substitutions, as well as future debt obligations.

Each DOT was executed between the same parties, ANB and Sleeping Indian.  Each DOT expressly contemplates certain events that occurred.  The plain terms of the First DOT and

---

[4] Those other items include the Headwaters stock, the other seven Lake Creek shares, and the personal property of the Sleeping Indian members.

each subsequent DOT contemplated that Sleeping Indian might "in the future," secure water rights and water stock, and that any water rights or stock would be part of the collateral. The plain terms also contemplate that Sleeping Indian might obtain additional loans from ANB to develop the Property.

For these reasons, the court concludes that when FNB purchased FDIC-R's interest under the First DOT, it stood first in line to collect any collateral identified therein—the same collateral identified in the Second and Third DOT's. More specifically, FNB was in first position for "all water . . . rights, . . . and water stock . . . that may now, or at any time in the future, be part of the real estate described above (all referred to as 'Property')." FNB has foreclosed now on that collateral, and is the owner of any rights to it as identified in the First DOT.

The court has considered and does not find compelling FDIC-R's arguments to try to avoid this clear result. FDIC-R points to the Addendum to the Third DOT that Sleeping Indian alone executed in April 2009 (some three years after the First DOT and 18 months after the Third DOT). Notwithstanding the identical language in the First and Third DOT's describing the collateral, FDIC-R contends that by "clarifying" the terms of the Third DOT well after it was executed, the Addendum somehow encumbers collateral the First DOT does not—the disputed Water Properties. The Addendum provides that:

1. FDIC is the receiver for ANB;

2. The Third DOT encumbers certain real property in connection with the Project; and

3. The Third DOT encumbers all water and riparian rights and water stock intended for the Project.

4. Certain water rights and Lake Creek and Wasatch Irrigation Company stock were purchased with the funds secured by the Third DOT.

15

In the Addendum, Sleeping Indian "confirms and clarifies that the [Third] Deed of Trust encumbers all of [Sleeping Indian's] right, title and interest in and to the Water Rights listed on the attached Exhibit B, and any subsequent rights for water relating to the Property resulting from the contribution or assignment of the Water Rights to the Service District."

The Addendum does not in any way alter the terms of the First DOT or diminish whatever collateral the First DOT encumbered. The First DOT provides that it is an integrated agreement. The First DOT was executed over a year before the Third DOT was signed, and three years before the Addendum. The First DOT means what its plain terms state, and encumbers the collateral it describes, regardless of what the subsequently executed Addendum claims to clarify regarding the Third DOT. By its own terms, the Addendum does not purport to amend, alter, or add to the meaning of the First DOT. In fact, the Addendum does not mention the First DOT (or the Second) at all.

The Addendum does not even purport to alter the terms of the Third DOT. Instead, Sleeping Indian simply summarizes in the Addendum certain terms of the Third DOT, notes what Sleeping Indian actually purchased with the third loan (water), "clarifies and confirms" that it intended by the Third DOT to encumber the Water Properties, and contends that ANB has a security interest in them while they are in escrow. Neither the recitals, nor the clarifications and confirmations change the Third DOT or what it encumbered. Indeed, the Addendum's "clarification" that the Third DOT encumbered the Water Properties only underscores that the identical language in the First and Third DOT's (as well as the Second DOT) each encumbered the subsequently-acquired water rights and stock as part of their identically defined collateral. The issue of what collateral secured the First DOT is discussed below in detail.

**B. The Disputed Water Properties are "part of the real estate" defined as collateral under the First DOT**

The next issue is whether the disputed Water Properties, now held by Twin Creeks for use on the Property, are part of the collateral defined in the first priority First DOT:

> [t]ogether with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber…, all water and riparian rights, wells, ditches, reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as 'Property').

The court finds that under this plain language and Utah law concerning contracts and water property, the Water Properties are part of the First DOT's collateral.

In reaching this conclusion, the court rejects FDIC-R's arguments that 1) because the water rights at issue are not "appurtenant to the land," they cannot be "part of the real estate" and thus not part of the First DOT's collateral, and 2) that the water stock was not transferred in the manner required by Utah security statutes evidenced by the transfer of securities or certificates as contemplated by Article Nine of the Utah Code.

FNB correctly notes that FDIC-R's argument confuses water rights encumbered through contracts, such as trust deeds, with water rights appurtenant in land conveyances. According to FNB, the water rights here need not be appurtenant but became "part of the real estate described above (all referred to as 'Property') when Sleeping Indian transferred the water rights at issue to Twin Creeks to hold in trust for use on the Project, defined in that Escrow Agreement to be the 295 acre development at Sleeping Indian Ranch. As discussed in more detail below, the court agrees with FNB's understanding and finds that the language of the parties' agreements determines this issue. Under the plain language of the First DOT the water rights and stock at

issue now became "water . . . rights . . . and water stock" and "part of the real estate . . . all referred to as 'Property,'" when Twin Creeks acquired them and contracted specifically for Twin Creeks to hold the requisite water in trust for use on the real estate.

The facts of this case are analogous to those in *Loosle v. First Fed. Sav. & Loan Ass'n.* 858 P.2d 999 (Utah 1993). In *Loosle*, the Utah Supreme Court found that a trust deed encumbered both inchoate and not-yet-appurtenant water rights associated with particular real estate. The *Loosle* court found that the trust deed there encompassed later-acquired water rights represented by a yet-to-be-finalized application, despite the fact that those water rights were neither vested nor appurtenant at the time. The Utah Supreme Court noted that inclusion in the trust deed of additional language beyond reference to appurtenances evidenced the parties' intent to convey more than simply appurtenant rights. This court concludes that the same result should inure here.

Further, FNB's interpretation of the relevant language in the First DOT is the only reading that enables the court to give effect to all of the terms in the agreement in the First DOT. Were the court to adopt FDIC-R's reading of the relevant passage, it must effectively write out of the First DOT terms that have specific and clear meaning. As in *Loosle*, the language of the First DOT here indicates that it was anticipated that water rights and water stock would be acquired after the First DOT. When those later-acquired water rights and stock at issue here were placed in trust specifically for use on the Property, they became water rights and water stock that were "part of" the property. The court concludes that FDIC-R's proposed reading does violence to clear language and the parties' intent throughout the loan transactions.

## 1. Appurtenance is not the test for encumbrance

Actual, beneficial use is the first and primary test for appurtenance. *Sanpete America v. Willardsen,* 2011 UT 48, ¶ 47, 269 P.3d 118, 128 (citing *Little v. Greene & Weed Inv.*, 839 P.2d 791, 796 (Utah 1992) ("[A] vested water right is considered appurtenant to the land conveyed only to the extent that it is used to the land's benefit at the time of the conveyance.")). In this case, however, the Project never moved beyond approval of a first phase. Nothing was ever built, and no water was actually used. Appurtenance is not, therefore, the issue.

Rather, the issue is when, if ever, did the Water Properties become "part of" the property within the meaning of the First DOT? The court finds that this occurred on October 15, 2007, the date when the acquisition and transfer of those water rights "for use on the Project" resulted in (as described in the Escrow Agreement) "guarantee[d] water service to the Project . . . to the extent required by the County and as necessary to fully develop the Project to completion, including residential and secondary (outdoor) water service for each lot."

## 2. Encumbrance turns on the intent of the parties

Appurtenant water is "part of" the land in the literal sense. Water and land are in that circumstance treated as one. That is why, when land is conveyed without mentioning water at all, any "appurtenant" water transfers automatically. *See* UTAH CODE ANN. § 73-1-11(1) ("A water right appurtenant to land" passes unless otherwise stated). That has long been Utah law. *Cf. Little v. Greene & Weed Inv.*, 839 P.2d 791, 796 (Utah 1992) ("[U]nless expressly reserved, a vested water right is considered appurtenant to the land conveyed only to the extent that it is used to the land's benefit at the time of the conveyance."); *Roberts v. Roberts*, 584 P.2d 378, 379

(Utah 1978) ("a deed which conveys land . . . also conveys the right to use appurtenant water, unless expressly reserved."); *Cortella v. Salt Lake City*, 72 P.2d 630 (Utah 1937).[5]

But water may be "part of" land in a contractual sense, regardless of appurtenance. Water becomes "part of" land for purposes of encumbrance when parties agree to it; which is to say that, barring illegality, contracting parties decide what is conveyed or what is encumbered. By so doing, parties are assumed to use their chosen contract terms according to their plain meaning, and the court interprets accordingly. *Reighard v. Yates,* 2012 UT 45, ¶ 23, 285 P.3d 1168, 1177 (citations omitted). Furthermore, contract terms are presumably used intentionally, requiring that the court "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id.* (citations omitted).

Here, the relevant parties—lender (ANB, with its overriding interest in the enhanced value of its collateral, better ensuring repayment), developer (Sleeping Indian, which without water service cannot sell a single lot and ultimately repay the lender), and water supplier (Twin Creeks, which in order to guarantee service must acquire new water rights but puts that burden where it belongs, on the developer), all agreed both that the Water rights would become a "part of" the property, and when that would occur.

### a. The First DOT's plain terms capture the Water Properties

The First DOT needs no interpretation beyond its plain terms. It conveyed in trust to secure the first loan the Project land:

> [t]ogether with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber…, all water and riparian rights, wells, ditches,

---

[5] The right to the use of water evidenced by irrigation company shares are not deemed, but still can be, appurtenant to land. UTAH CODE ANN. § 73-1-11(4).

reservoirs, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as 'Property').

Knowing the purpose of their transaction, the parties went well beyond "appurtenant" water, identifying additional "water and riparian rights," "water stock" that "at any time in the future" becomes "part of the real estate . . . ." Equating "appurtenances" and "part of the real estate," the FDIC-R would have the instrument read "appurtenances" and . . . more appurtenances—effectively omitting the equally important term "part of," which plainly supplements "appurtenances."

*Loosle* draws the encumbrance—appurtenance distinction:

Not only does the trust deed include all 'appurtenances,' but also the language specifically purports to include all 'rights,' 'water,' and 'water rights' now or hereafter attached to the property. Because, pursuant to section 73-1-11, a perfected water right will pass as an appurtenance without specifically mentioning the vested water right, the trust deed's use of additional language beyond 'appurtenances' to include 'water and water rights' evidences an intent to convey water rights that had not yet vested and become appurtenant.

858 P.2d at 1003.

**b. The Escrow Agreement made the Water Properties "part of" the Property by guaranteeing water service in exchange**

By entering into the Escrow Agreement, Twin Creeks agreed to two primary terms. First, it agreed that the delivery of the Water Properties "for use on the Project," by itself, "guarantee[d]" water service to the Project sufficient for full build-out, indoor and outdoor use. Second, it agreed to assume responsibility for filing the administrative applications concerning those rights:

[Twin Creeks] will own, manage and develop the Water Rights as it sees fit for the benefit of the Project and for the general benefit of [Twin Creeks] within its jurisdiction. [Twin Creeks] will file, at its own risk and expense, any necessary

change applications or other administrative filings as necessary to develop the Water Rights for its beneficial use. [Twin Creeks] will take all risk . . . associated with the Water Rights, including . . . reduction of the right . . . .

The guaranteed water service effective October 15, 2007 under the Escrow Agreement did not depend on any administrative approval. Sleeping Indian delivered the Water Properties "for use on the Project," and Twin Creeks "require[d] the transfer of the water rights and/or water shares as necessary for the Project before granting a "Will-Serve Letter." All Sleeping Indian had to do was transfer the appropriate quantity to Twin Creeks, a figure provided by the County.

Water on the Project was from that point guaranteed, which is all that concerned Sleeping Indian (from a development, marketing and loan repayment perspective), and ANB (from an enhanced collateral perspective). Twin Creeks would then seek the administrative changes necessary to allow the Water Properties to be used by it, either on the Project or wherever it needed within its service area. The actual source of the wet water mattered to no party but Twin Creeks. Administrative risk was passed to Twin Creeks. The Escrow Agreement is the instrument that made the Water Properties "part of" the property within the meaning of the First DOT because the acquisition and transfer of those rights "for use on the Project" are what triggered water service.

The FDIC-R contends that the word "Property" as defined by the parties does not mean the "water . . . rights" and "water stock" at issue. That would render these highly descriptive terms, which do not mean anything if not connected to using water on land and which describe extremely valuable property, as mere surplus. Sophisticated parties used the term "appurtenances," which by definition already captures any appurtenant water rights. They did

22

not even have to use that term because appurtenant water rights transfer unless reserved. UTAH CODE ANN. § 73-1-11(1). The same parties went much further, capturing other water properties to be later-acquired.

### 3. The Escrow Agreement identifies the Water Properties that became "part of" the Project property

The FDIC-R attempts to extricate the First DOT from its context. This case centers on a loan to start a nearly 300-acre development from scratch, which was impossible without water. The entire Project was conceived and pitched to ANB under the overarching and inescapable requirement that "each residential lot was required by Wasatch County ordinance to have sufficient water for residential use, plus irrigation water sufficient for a minimum of one-quarter acre of irrigated area. Additional water could be required depending on individual lot circumstances."[6] Contracting parties invoke extant law in their agreement. *See Hall v. Warren*, 632 P.2d 848, 850 (Utah 1981) (parties are "presumed to have in mind all the existing laws relating to the contract, or to the subject matter thereof.").[7]

In *Loosle*, the court explained that, "[a]lthough the trust deed does not specifically mention filings with the state engineer regarding the use of the spring or well, references to these filings would have been impossible because they were unascertained in 1980 when the trust deed

---

[6]*See generally* Wasatch County Ordinance §16.08.14(5).

[7] *Hall* quotes the general rule from 17 Am.Jur.2d, Contracts, § 257, at 654-656:

It is a general rule that contracting parties are presumed to contract in reference to the existing law; indeed, they are presumed to have in mind all the existing laws relating to the contact, or to the subject matter thereof. Thus, it is commonly said that all existing applicable or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it just as if an express provision to the effect were inserted therein, except where the contract discloses a contrary intention. . . .

23

was signed." 858 P.2d at 1003. Similar to *Loosle,* neither Sleeping Indian nor ANB here knew when the First DOT was signed at what point in time the additional water would be acquired; nor did they know its composition—water rights, stock or a combination. But they did know that it was coming, and they contracted for that eventuality. The plain terms of each DOT make that clear in the terms anticipating water rights and stock obtained "in the future." And in the Escrow Agreement, Sleeping Indian and Twin Creeks further contracted concerning state engineer matters.

*Loosle* explains that the question of encumbrance is not divorced from the larger transaction. Until Sleeping Indian acquired the water it needed, represented by both a water right and by "water stock," the entire Project was in doubt. Upon acquiring that water and transferring it under the Escrow Agreement "for use on the Project," in exchange for guaranteed water service, the actual right to use the acquired water remained, and remains, inchoate, hence Twin Creeks' agreement to pursue the necessary administrative changes. That risk, however, was assumed by Twin Creeks in the same transaction that resulted in guaranteed water service, thereby making the water "part of" the property within the meaning of the First DOT.

Sleeping Indian acquired the Water Properties for use on the Property, and then transferred them to Twin Creeks in exchange for actual water service. That is what made the Water Properties "part of" that land for purposes of encumbrance within the meaning of the First DOT. Indeed, it can be said that water service on the Project was "perfected," but in the contractual sense, not as a matter of water law. That guarantee happened only because the Water Properties were acquired for the Project. There was simply no other way to do it because the

24

parties did not know when the First DOT was signed what, if any, water would be acquired.

*Loosle* is again instructive:

> Although the water rights were not appurtenant to the property, we agree with the trial court that the trust deed encumbered all water rights, both inchoate and perfected. *Therefore, any rights or interest acquired by the Loosles after signing the trust deed, including their inchoate rights and documents evidencing that right or interest*, are now owned by First Federal by virtue of its purchase at the foreclosure sale.

*Loosle*, 858 P.2d at 1003 (emphasis added).

Because the Project failed for other reasons—the unfortunately timed real estate crash—the transfer to Twin Creeks was not "irrevocable," but that only meant that the Water Properties could be returned, perhaps for use elsewhere, but at least as further protection for ANB's first position. This water could not remain in limbo indefinitely. Unused water is subject to abandonment or forfeiture. UTAH CODE ANN. § 73-1-4. Twin Creeks could not, therefore, simply hold the Water Properties. Its interest was in seeing that it achieved the administrative approval necessary to use that water in its service area.

The "inchoate" nature of the Water Properties is found in the fact that the specific water rights and stock were yet to be approved for use on the Project, but neither Sleeping Indian nor ANB were concerned. Neither the lender nor the developer is concerned with what water is used on the land, only that water is guaranteed. Not a single lot could be sold without it. Water service is what the Escrow Agreement guaranteed, with Twin Creeks assuming the risk of any administrative changes. Twin Creeks, in other words, was free to use any approved water at the

Project. The Water Properties acquired over time by Sleeping Indian were entirely inchoate as to the Project land, and they still are.[8]

FDIC-R attempts to distinguish *Loosle* by explaining *Loosle's* rationale—that the trust deed in that case demonstrated "an intent to convey water rights that had not yet vested and become appurtenant." (FDIC-R Memo., Dkt. 37, at 16). The *Loosle* deed captured the yet to vest right "because it would have been appurtenant but for the fact that it had not vested." (*Id.*). This is a distinction with no difference. The First DOT, without even trying, captured appurtenant rights because they transfer by operation of law. UTAH CODE ANN. § 73-1-11(1).

The issue is not appurtenance, or "vesting." The issue is whether, at some point prior to the foreclosure sale, the Water Properties became "part of" the land. They did when Twin Creeks accepted them for the only reason they were purchased—to put water "on the Project," just as the First DOT contemplates. That exchange resulted in Twin Creeks' "guarantee [of] water service to the Project . . . to the extent required by the County and as necessary to fully develop the Project to completion . . . ." That is when as a matter of contract the water became "part of" the property and thus encumbered by the First DOT.

---

[8] The FDIC-R contends that if the water rights are encumbered, as FNB contends, then they could not be transferred under the Escrow Agreement, which provides for transfer "free and clear of any liens, mortgages, or other rights of Sleeping Indian . . . ." But the Escrow Agreement accounts for this. First, Sleeping Indian had no remaining "rights" in the water rights after the transfer unless the Project was not approved, in which case the rights would be returned. Second, Sleeping Indian assumed the risk of transferring encumbered rights when it represented and warranted that it had "the right and ability to re-convey said water rights . . . ." Its breach, in other words, was its problem. ANB was safe in its first trust deed position, so any claim by Twin Creeks was subject to that senior lien. If the Project gets platted and lots are sold, all parties are satisfied: ANB gets paid, and the transfer to Twin Creeks is "irrevocable."

26

Land acquisition was just the start. There is no economic benefit without use, which means development. "The substantial value of property lies in its use," and where the right of use is denied, "the value of the property is annihilated and ownership is rendered a barren right." *City of Akron v. Chapman,* 116 N.E.2d 697, 700 (Ohio 1953) (citations omitted). There is no development here without water. Wasatch County Ordinance §16.08.14(5) (*Water Requirements*). Knowing that, Sleeping Indian set out to acquire what it needed. It was repeatedly told that water was essential, and it acquired that water, as the undisputed facts demonstrate. In July and twice in September 2007, Wasatch County reiterated the water requirements, including identifying the precise amount of water necessary on September 5, 2007. Thus, on October 17, 2007, Sleeping Indian signed the Third DOT to secure the third loan from ANB in the principal amount of $2,700,000 for the purchase of additional water. The Third DOT is secured by the same trust property as the First and Second DOT's.

Once Sleeping Indian had the necessary water, it then took the next required step— packaging that water and delivering it to Twin Creeks "for use on the Project," which resulted in the Escrow Agreement's water service "guarantee." That agreement was the final step in securing water "for use on the Project." Twin Creeks was then obligated to serve water, which in turn allowed Sleeping Indian to market its lots, setting the stage to repay the lender. The economic crash that shortly ensued doomed the Project, but not until after the water "for use on the Project" had been purchased and delivered to Twin Creeks.

The parties are not able to decide that water is "part of" property in a water law sense, *i.e.,* appurtenant. They can only contract based on the law and their agreed risk. Therefore, when they identified appurtenances and water rights that at "any time" became part of the

27

property, they did all they could under *Loosle* and Wasatch County ordinances to ensure that ANB had encumbered everything connected to the land. ANB and Sleeping Indian were equally motivated to acquire the water needed for development. Sleeping Indian did that using ANB's money, and Twin Creeks agreed, guaranteeing water service in exchange for the delivery of the Water Properties "for use on the Project."

Based upon the foregoing and the reasons stated on the record at the hearing, the court GRANTS FNB's Motion for Summary Judgment (Dkt. 42), and DENIES FDIC-R's Motion for Summary Judgment. (Dkt. 36).

## II. THE PARTIES' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT

During the course of this quiet title action, FNB and FDIC-R engaged in discussions concerning the somewhat complicated series of conveyances of one of the water rights at issue, namely Water Right No. 55-12315. The parties agreed concerning the ultimate disposition of that water right and stipulated to the relevant facts as discussed below.

On or about September 20, 2007, the Utah Division of Water Rights assigned Water Right No. 55-12315 to 97 acre-feet of a segregated portion of Water Right No. 55-9269, and listed Aspen Ridge Ranches, LLC as the owner of Water Right No. 55-12315. On or about October 15, 2007, Aspen Ridge Ranches, LLC quit claimed to Island Peak Ranch, LLC 97 acre-feet of Water Right No. 55-12315, being a segregated portion of 55-9269. On or about that same day, October 15, 2007, Aspen Ridge Ranches, LLC owned no portion of Water Right No. 55-9269 or 55-12315, but did have Water Right No. 55-12315 listed in its name on the Division records.

Prior to 2007, Aspen Ridge Ranches, LLC deeded 207.6 acre-feet of Water Right No. 55-9269 to Island Peak Ranch, LLC. On or about October 15, 2007, Island Peak Ranch, LLC quit claimed to WS Sleeping Indian Ranch, LLC 97 acre-feet of Water Right No. 55-12315, being a segregated portion of 55-9269. On October 15, 2007, Island Peak Ranch, LLC still owned 97 acre-feet of Water Right No. 55-9269, which was now described on the records of the Utah Division of Water Rights as Water Right No. 55-12315.

The Water Right Quitclaim Deed from Island Peak Ranch, LLC to WS Sleeping Indian Ranch, LLC dated October 15, 2007, recorded October 26, 2007, as entry number 327767 with the Wasatch County Recorder, conveyed to WS Sleeping Indian Ranch, LLC 97 acre-feet of Water Right No. 55-12315, being a segregated portion of 55-9269. By deeding the 97 acre feet of Water Right No. 55-12315, Island Peak Ranch, LLC conveyed 97 acre feet of Water Right 55-9269 which showed on the records of the Utah Division of Water Rights as 55-12315.

Aspen Ridge Ranches, LLC, Island Peak Ranch, LLC, WS Sleeping Indian Ranch, LLC and Utah Water Company are all parties to this quiet title action and each has defaulted.[9]

Taken together, these stipulated facts mean that WS Sleeping Indian Ranch, LLC received full legal title to Water Right 55-12315 on October 15, 2007. Furthermore, FNB and F.D.I.C. are the only parties necessary to this joint summary judgment. Thus, the court GRANTS the parties' Joint Motion for Partial Summary Judgment. (Dkt. 39).

---

[9] Defendants WS Sleeping Indian, Raymond Weller and Robert Madsen answered FNB's Complaint in this action, but have since refused further participation in the litigation. Their former counsel was served with the parties' Joint Motion and Memorandum in Support of Motion for Summary Judgment.

## JUDGMENT

Based on the foregoing, the court enters the following judgment:

A. The Water Right Quitclaim Deed from Island Peak Ranch, LLC to WS Sleeping
   Indian Ranch, LLC dated October 15, 2007, recorded October 26, 2007, as entry
   number 327767 of the Wasatch County Recorder, conveyed to WS Sleeping Indian
   Ranch, LLC 97 acre-feet of Water Right No. 55-12315, being a segregated portion of
   55-9269.

B. By deeding the 97 acre feet of Water Right No. 55-12315, Island Peak Ranch, LLC
   conveyed 97 acre feet of Water Right 55-9269, which showed on the records of the
   Utah Division of Water Rights as 55-12315.

C. FNB's title to the following water rights and water stock shares is hereby quieted, and
   FNB is the lawful owner of the following:

   1. Water Right No. 55-12315 (representing 97 acre-feet of water segregated
      from Water Right No. 55-9269);

   2. 28.82 acre-feet of M&I contract water on the records of Wasatch County
      Special Service Area Number 1;

   3. The following Lake Creek Irrigation Company stock certificates for the
      Sleeping Indian Ranch development:

      i. A portion of Certificate #1031 in the District's name for 43.371
         primary shares (of which 13.833 primary shares are for the Sleeping
         Indian Ranch development). This Certificate replaced Certificate
         #963;

      ii. Certificate #530 in the District's name for 21.0 first class shares (of
          which 21.0 first class shares are for the Sleeping Indian Ranch
          development);

      iii. Certificate #532 in the District's name for 38.0 second class shares;
           and

iv. Certificate #533 in the District's name for 3.5 third class shares.

4. The following Wasatch Irrigation Company stock certificates:

   i. Certificate #4517 for 0.80 shares;

   ii. Certificate #4912 for 0.34 shares; or alternatively

   iii. if the share exchange with Heber City is not reversed, 3.876 acre feet of M&I contract water.[10]

D. Twin Creeks Special Service District is hereby ordered to execute and deliver to FNB a quitclaim deed to Water Right No. 55-12315, consisting of 97 acre feet, being a segregated portion of Water Right No. 55-9269.[11] Twin Creeks is further ordered to deliver to FNB the executed but unrecorded Water Right Quitclaim Deed delivered by WS Sleeping Indian to Twin Creeks for WR 55-12315.

E. Twin Creeks is ordered to endorse and deliver to FNB each of the foregoing share certificates, which FNB may present for registration or transfer into its name pursuant to Utah Code Annotated § 70A-8-301, *et seq*.

F. Twin Creeks is ordered to engage with Heber City and request that the share exchange with Heber City be reversed, and then to deliver to FNB an endorsed share

---

[10] Twin Creeks explained that "[t]he water represented by these shares is not usable at the Sleeping Indian Ranch development, so the District conveyed these shares to Heber City in exchange for 3.876 acre-feet of M&I water that can be used at the development. Accordingly, the stock certificates are now in the name of Heber City, and the District no longer has possession of the stock certificates. The District may be able to undo the exchange, if necessary. The District will release the M&I water or shares as instructed by the court."

[11] On April 12, 2013, and without notice to the parties, the Utah Division of Water Rights re-combined WR 55-12315 and 55-9269. On August 12, 2013, the Utah Division of Water Rights restored the segregation of Water Right No. 55-12315 for 97 acre feet.

certificate for 1.14 shares of Wasatch Irrigation Company, if said exchange is reversed.

G. Twin Creeks is ordered to request that Wasatch County Special Service Area No. 1 record that FNB is the owner of 28.82 acre feet of M&I contract water, or in the alternative, transfer and assign to FNB, the 28.82 acre feet of M&I contract water identified and inventoried by Twin Creeks on May 25, 2011. If the share exchange with Heber City is not reversed as described above, and endorsed certificates are not delivered to FNB, then Twin Creeks is ordered to either request that Wasatch County Special Service Area No. 1 record that FNB is the owner of an additional 3.876 acre feet of M&I contract water or transfer and assign to FNB the additional 3.876 acre feet of M&I contract water.

H. As the prevailing party against the FDIC-R, and pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, FNB is awarded its costs incurred in this action. FNB is to submit a bill of costs and otherwise comply with Local Rule 54-2.

I. The Clerk of Court is directed to close the case.

It is so ORDERED.

Dated this ___26th___ day of __September__ 2013

**BY THE COURT**

Robert J. Sh___
United State District Court

32